FRANK SARCONE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sarcone v. Comm'r
Docket No. 15468-89
United States Tax Court
T.C. Memo 1991-647; 1991 Tax Ct. Memo LEXIS 689; 62 T.C.M. (CCH) 1647; T.C.M. (RIA) 91647; December 30, 1991, Filed *689 Decision will be entered under Rule 155. Laurin W. Schutter, for the petitioner. Henry E. O'Neill, for the respondent. CLAPP, Judge. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined the following deficiencies in and additions to petitioner's Federal income taxes: Additions to tax
Year
Deficiency
Sec. 6651(a)(1)
Sec. 6653(a)
1977
$ 529
--
$ 26
1978
14,355
--
718
1979
125,754
$ 1,982
7,453
1980
3,423
--
171
Parts of the deficiencies determined for the taxable years 1979 and 1980 are due to respondent's disallowance of deductions reported on petitioner's 1981 and 1982 tax returns in connection with petitioner's yacht-chartering activity. After concessions by the parties, the issues are: (1) Whether petitioner's yacht-chartering activity was an "activity not engaged in for profit" within the meaning of section 183(a). We hold that it was not engaged in with the requisite profit objective. Petitioner, therefore, is not entitled to deduction expenses relating to the activity under sections 162 or 212, and is not entitled to an investment tax credit under sections 38 and 46. (2) Whether petitioner had unreported taxable *690 income of $ 2,707 in 1979 and $ 72,009 in 1980 as determined by respondent. We hold that he did. (3) Whether petitioner is entitled to a $ 10,000 bad debt deduction in 1981. We hold that he is not. (4) Whether petitioner is liable for additions to taxes under section 6653(a). We hold that he is. All section references are to the Internal Revenue Code as amended and in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT We incorporate by reference the stipulation of facts and attached exhibits. Petitioner was a single taxpayer residing in Montclair, New Jersey, during the years 1977 through 1982, the time period at issue in this case. Petitioner resided in Kula, Hawaii, at the time of the filing of the petition. Petitioner was the sole owner of three corporations during the time period at issue. The three corporations, Millburn Book Corp. (Millburn), Robert Collier Books, Inc. (Collier), and Nancy Prior Books, Inc. (Nancy Prior), were involved in the publishing and marketing of mail order books. In 1982, Millburn pled guilty to Federal fraud charges relating to its marketing of mail order diet plans. *691 Millburn was required to establish a $ 50,000 fund to repay unsatisfied customers, and petitioner and two others were enjoined from further efforts to market or distribute the diet plans. Later in 1982, Millburn and Collier were placed in bankruptcy. In 1984, the bankruptcy trustee initiated several suits against petitioner and others seeking recovery of certain funds. The suits alleged that Millburn and Collier made preferential and fraudulent transfers to petitioner within 1 year of the 1982 bankruptcy filing. These suits were settled in 1987. During 1979, petitioner received royalty payments from Millburn in the amount of $ 306,722.73 and Nancy Prior in the amount of $ 44,701.00. In addition, petitioner received shareholder loans totaling $ 261,048.06 from Millburn during 1979 and 1980. Certain amounts ($ 14,811.16 in 1979 and $ 23,316.88 in 1980) were deposited directly into Florida bank accounts in the name of Champagne Cruises, Inc. (Champagne Cruises), and pertained to a motor yacht which petitioner acquired in 1979. Repayments on these loans in the amount of $ 169,146.06 were made by petitioner to Millburn between 1980 and 1982. During 1979 and 1980, petitioner maintained *692 two personal savings accounts at Montclair Savings Bank in New Jersey, account numbers XX5182 and XX2430. Petitioner also maintained checking account number XX-XXX4895 at Montclair Savings Bank for his New Jersey rental property. Analysis of these accounts for 1979 yields unexplained deposits in the amount of $ 2,707. Similarly, analysis of these accounts for 1980 yields unexplained deposits in the amount of $ 72,009. In August 1979, petitioner purchased a 65-foot motor yacht named "Champagne" for $ 75,000. Petitioner's title to the vessel was formally recorded on November 5, 1979. Built in 1946, the yacht's wooden construction was primarily single plank mahogany. Petitioner first saw the yacht in June 1979 at the Miami, Florida, dock where it was being moored. The yacht was owed by Champagne Cruises, which had purchased it in January 1979. While Champagne Cruises did conduct some charter cruises, the extent of the chartering activity is unclear. Petitioner was not a knowledgeable yachtsman and had never been involved in the charter business. Petitioner inquired about the chartering business prospects in the south Florida area from several people, namely, Mark Elliot (Elliot), *693 Champagne Cruises' president and part owner of the vessel, the dockmaster where the yacht was moored, people at a nearby hotel, and Ronald Davis (Davis), petitioner's local counsel. The yacht had two diesel engines upon which petitioner had an engine survey performed in July 1979 to determine their condition. The survey was done at Davis' suggestion. While the engines were serviceable, the yacht underwent significant repair work after petitioner's purchase. Petitioner and Elliot agreed that Elliot, who lived in Florida, would oversee the yacht's repairs and operations in Florida. Under the oral agreement, Elliot was to receive 50 percent of any profits resulting from any charter activity as compensation. Petitioner hoped to charge about $ 500 per charter while incurring operating expenses of about $ 100. While petitioner never reported any profit for the yacht-chartering activity on his tax returns for the years at issue, it is unclear whether Elliot received any compensation under the terms of the agreement. Elliot withdrew from the agreement in March 1980. Prior to selling the yacht, Elliot maintained checking account number XXX-6552 in the name of Champagne Cruises at *694 Flagship National Bank in Miami, Florida. Elliot continued to maintain that account and also opened account number XXX-4978 in the same name at the same bank. Petitioner caused Millburn to deposit $ 14,811.16 during 1979 and $ 23,316.88 during 1980 to these accounts on behalf of petitioner. These transactions were treated as shareholder loans to petitioner from Millburn. Elliot used these bank accounts to pay for the Champagne's repair bills and expenses as well as for other unrelated purposes. Millburn chartered petitioner's yacht once during 1979 for a 10-day cruise. Schedule C of petitioner's 1979 tax return reflected receipts of $ 10,000 from the yacht-chartering activity. These were the only proceeds reported from petitioner's yacht-chartering activity on his 1979 tax return. Petitioner claims that these proceeds represent payments from Millburn for "business use to promote book sales." There were no receipts reported in connection with petitioner's yacht-chartering activity on his 1980 or 1981 tax returns. Receipts in the amount of $ 2,500 were reported for 1982. Schedule C of petitioner's 1979 tax return reported "repairs and maintenance" expense of $ 14,811 and depreciation *695 expense of $ 5,650, resulting in a loss reported for 1979 for the activity of $ 10,461. Petitioner also claimed an investment tax credit of $ 7,500 in 1979 for his purchase of the yacht. Losses for 1980, 1981, and 1982 were $ 39,832, $ 9,493, and $ 32,472, respectively. As in 1979, a substantial portion of the deductions reported for subsequent years were for repairs and maintenance ($ 32,897 repairs in 1980, $ 2,062 repair in 1981, $ 11,286 repairs and $ 15,437 maintenance in 1982). The vast majority of expenditures that petitioner claimed as deductions for his yacht-chartering activity was for repair, restoration, or rehabilitation of the Champagne, rather than for operational expenses. Other nonoperational expenses included depreciation allowances, legal, and other costs incurred to free the Champagne from a boatyard levy for nonpayment of repair bills. Shortly after purchasing the yacht, petitioner caused repair work on the Champagne to commence in Florida. An invoice dated January 8, 1980, from Archimedes Marine Basin, Inc. (Archimedes), includes charges for 41 "lay days" at the marina, indicating that the yacht was in the marina and unavailable for charter from at least *696 November 1979. Work continued on the yacht at Archimedes throughout January and February 1980. In March 1980, the vessel was moved to Belcher Yacht Yard (Belcher) where work continued. On September 27 1980, Belcher refused to release the yacht because of petitioner's failure to pay repair bills, and Belcher filed suit to recover on the unpaid bills on December 10, 1980. The yacht experienced further deterioration during this time. Belcher continued possession until August 27, 1981, when, after settlement of Belcher's claims, the vessel was moved to Jones Boat Yard (Jones) for further repairs. Jones also filed suit for nonpayment of repair bills on December 14, 1981. After release on bond on February 25, 1982, the vessel was moved to New Jersey for further repairs. During the time period from March 1980 through the time the yacht was lost at sea in 1982, the Champagne was not in condition to be chartered and was not chartered. In November 1980, petitioner advertised the yacht for sale at $ 150,000. Petitioner would have considered $ 115,000, but no offers were received. Separately, petitioner loaned $ 10,000 interest free to Dominic Cerrulli (Cerrulli), who was starting *697 a business retailing prints and reproductions of art works. Cerrulli's business was to occupy a portion of the bottom floor of a commercial building owned by petitioner. No promissory note or any other loan documentation was executed or prepared. Petitioner's only evidence of the transaction was a check drawn on petitioner's account payable to both petitioner and Cerrulli. Cerrulli was to repay the loan as well as rent for the space in petitioner's building whenever and if ever Cerrulli's business became profitable. Petitioner did not make the loan in connection with the conduct of a trade or business. The loan was never repaid. OPINION The first issue for decision is whether petitioner's yacht-chartering activity was an "activity not engaged in for profit" within the meaning of section 183(a). Petitioner asserts that it was engaged in for profit and, therefore, claimed an investment tax credit for the tax year 1979, as well as operating losses for 1979 through 1982, with net operating loss (NOL) carrybacks to 1977 and 1978. Respondent disallowed the credit and losses based on his determination the activity was an activity not engaged in for profit. An "activity not engaged *698 in for profit" is defined in section 183(c) as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." Section 162 allows a taxpayer to claim a deduction for ordinary and necessary expenses paid or incurred in the carrying on of a trade or business. Section 212 allows a taxpayer to deduct expenses incurred in connection with an activity engaged in for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income. To deduct expenses under sections 162 or 212, the taxpayer must show that he engaged in the activity with an actual and honest objective of making a profit. Sec. 1.183-2(a), Income Tax Regs.; Beck v. Commissioner, 85 T.C. 557, 569 (1985). Profit in this respect means economic profit independent of tax savings. Antonides v. Commissioner, 91 T.C. 686, 694 (1988), affd. 893 F.2d 656 (4th Cir. 1990). The existence of the requisite profit objective is a factual question that must be determined upon the entire record. Benz v. Commissioner, 63 T.C. 375, 382 (1974). *699 Although the taxpayer's expectation of profit need not be reasonable, the facts and circumstances must indicate that the taxpayer entered into or continued the activity with the objective of making a profit. Sec. 1.183-2(a), Income Tax Regs.; Golanty v. Commissioner, 72 T.C. 411, 425 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). Petitioners bear the burden of proving that they had the requisite profit objective. Rule 142(a); Beck v. Commissioner, supra at 569. This determination is made upon consideration of all the relevant facts and circumstances, with greater weight placed on the objective facts than the taxpayer's mere statement of intent. Sec. 1.183-2(a), Income Tax Regs.; Golanty v. Commissioner, supra; Engdahl v. Commissioner, 72 T.C. 659, 666 (1979). Section 1.183-2(b), Income Tax Regs., provides a nonexclusive list of factors bearing on whether an activity is engaged in for profit. We will review them in turn along with the corresponding relevant facts, if any, present in this case. No single factor, however, nor even the majority of factors, *700 is controlling. Sec. 1.183-2(b), Income Tax Regs.; Golanty v. Commissioner, supra.
1. Manner in which the taxpayer carries on the activity. Elements relevant to this factor include the businesslike manner with which the activity is conducted, the completeness and accuracy of the business records, comparability to similar profitable businesses, and changes in methods of operation to improve profitability. Petitioner kept no formal records, accounts, or logs in connection with his yacht-chartering activity. There was no separate bank account to control cash inflows and outflows for the activity. The bank account Elliot used for paying the yacht's repair bills and expenses also was used for other purposes. The relationship with Elliot was not documented or closely defined in any way. There was considerable dispute at trial regarding the exact date petitioner acquired title to the yacht, and whether he planned to take title to it personally or via a wholly owned corporation, Treasure Island Cruises, Inc., that petitioner's attorney organized for him. While we conclude that title to the yacht vested in petitioner, we believe this point, in itself, *701 is largely irrelevant to the determination of whether the activity was engaged in for profit. The considerable confusion does show, however, the lack of formality and preciseness with which petitioner conducted the yacht transactions. We note, for example, that while the yacht was purchased in August 1979, it was reported to be acquired on November 5, 1979, on petitioner's 1979 tax return. 2. The expertise of the taxpayer or his advisers. Petitioner was not an experienced seaman, nor did he have any background in the yacht-chartering business. Petitioner's investigation of chartering business conditions and prospects was cursory. After purchasing the yacht, petitioner did not seek business advice or assistance from any one except Elliot, who withdrew from their agreement shortly after petitioner acquired the yacht. 3. The time and effort expended by the taxpayer in carrying on the activity. While petitioner expended some time in purchasing the vessel, there is no indication that he invested any significant time or personal effort beyond that. Petitioner responded only when two different boatyards refused to release the vessel for nonpayment of repair bills, but again *702 such action was through surrogates. Significantly, we note that petitioner did not take the time to formally document his relationship with Elliot, document or track the charters that he claimed occurred during 1979 and 1980, or forecast the profitability of the venture in any formal way. 4. Expectation that assets used in activity may appreciate in value. Petitioner placed an advertisement for his yacht in a yachting magazine asking $ 150,000, twice what he paid for it. No offers were made. Despite the repair and restoration work petitioner planned for the yacht, there is no evidence that it was reasonable to assume that the yacht would significantly appreciate in value. Most of the actual expenditures petitioner made on the vessel were for repairs and reconditioning, as well as to recover it from boatyards. No significant additions or improvements were made. 5. The success of the taxpayer in carrying on other similar or dissimilar activities. Petitioner had never previously engaged in a yacht-chartering business but did own three publishing companies. Petitioner's publishing activity did have some success as evidenced by his substantial royalty income in 1979 *703 and shareholder loans in 1980. Two of these businesses, however, were subsequently placed in bankruptcy after one pled guilty to Federal fraud charges. 6. The taxpayer's history of income or losses with respect to the activity. Petitioner's yacht-chartering activity never attained profitability and reported only $ 10,000 in receipts, and that was from his wholly owned corporation. Petitioner claims that other charters occurred during 1979 and 1980 that were paid in cash, which was in turn used to pay expenses. We do not accept petitioner's self-serving testimony in this regard. We have found that petitioner's yacht was in a boatyard from November 1979 through at least January 1980. In addition, we have found that the vessel was not in condition to be chartered and was not chartered from March 1980 through the time the yacht was lost at sea in 1982. Even if we assume that petitioner chartered his yacht several times between August 1979 and March 1980, we are not convinced on this record that petitioner's activity rose to the level of an activity engaged in for profit within the meaning of section 183. 7. The amount of occasional profits, if any, which are earned.
*704 Petitioner's yacht-chartering activity never earned any profits. 8. The financial status of the taxpayer. Petitioner owned commercial real estate in both New Jersey and Florida and owned three book publishing corporations. Petitioner received substantial royalty income in 1979. He was therefore in a position to take advantage of the investment tax credit and deductions resulting from entering into and maintaining an unprofitable yacht-chartering activity. 9. Elements of personal pleasure or recreation. Petitioner took a couple of trips on the yacht, but the record indicates that his personal use was practically nonexistent. We are not convinced that the objective facts here show that petitioner had the requisite actual and honest profit objective. Based upon the record herein, we hold that petitioner's yacht-chartering activity was not engaged in for profit within the meaning of section 183. Therefore, petitioner is not entitled to an investment tax credit in 1979, losses in 1979, 1980, 1981, and 1982, and NOL carrybacks to 1977 and 1978 in connection with the activity. We also must decide whether petitioner had unreported taxable income of $ 2,707 in 1979 and *705 $ 72,009 in 1980 as determined by respondent using the bank deposit analysis method. It is well settled that a bank deposit is prima facie evidence of income where a taxpayer has failed to maintain adequate records to explain the amount and source of the deposit. Tokarski v. Commissioner, 87 T.C. 74, 77 (1986); Estate of Mason v. Commissioner, 64 T.C. 651, 656-657 (1975), affd. 566 F.2d 2 (6th Cir. 1977). Petitioner has the burden of proving that respondent's determination was not correct and that such deposits are not taxable income. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 78 L. Ed. 212, 54 S. Ct. 8 (1933). While it is not entirely clear, petitioner seems to aggregate his reply to respondent's unreported income determinations for 1979 and 1980. Petitioner generically asserts that the unreported income determined by respondent is not taxable in those years because those amounts represent shareholder loans from Millburn that were settled for less than face value in 1987. Therefore, according to petitioner, those amounts are taxable as cancellation of indebtedness income in 1987 to the extent they exceed the settlement amount. *706 Sec. 61(a)(12). We find that characterization unsupported by the record. The parties have stipulated that petitioner received shareholder loans totaling $ 261,048.04 from Millburn during 1979 and 1980, and that petitioner repaid $ 169,146.06 between 1980 and 1982. Thus, outstanding loans from Millburn to petitioner did exist. Petitioner points to claims made by the bankruptcy trustee on behalf of Millburn and Collier that petitioner received preferential and fraudulent transfers. Petitioner claims that these transfers include the unpaid portion of the shareholder loans he received in 1979 and 1980 from Millburn. As such, the loans would be covered by the 1987 settlement and discharged in that year. Therefore, cancellation of indebtedness income would arise in 1987. However, the actions taken by the bankruptcy trustee to recover the allegedly preferential and fraudulent transfers in 1984 specifically state that the transfers sought to be recovered occurred within 1 year of the commencement of the bankruptcy proceedings. Since the bankruptcy proceedings were commenced in 1982, the 1979 and 1980 loans referred to by petitioner cannot be a part of transfers sought to be recovered *707 and, thus, cannot be part of the 1987 settlement. Therefore, there is no merit in petitioner's argument that the unreported income amounts determined by respondent are cancellation of indebtedness income to petitioner in 1987. Since petitioner puts forth no other evidence or explanation, we sustain respondent's determination that petitioner had unreported income of $ 2,707 in 1979 and $ 72,009 in 1980. We also must decide whether petitioner is entitled to a $ 10,000 bad debt deduction for 1981. Petitioner claims that he is entitled to a deduction under section 165 without reference to section 166. Section 165(c)(2) allows for a deduction for "losses incurred in any transaction entered into for profit, though not connected with a trade or business." Section 166(d)(1)(B) allows a short-term capital loss for any nonbusiness bad debt that becomes worthless during the tax year. Since petitioner himself characterizes the transaction as a loan, it must be deductible, if at all, under section 166(d)(1)(B). Three elements are essential to allowance of a bad debt deduction: (1) There must be a bona fide debt in a proven amount; (2) the debt must have value at the beginning of the year; *708 and (3) it must become worthless during the year. Holderness v. Commissioner, T.C. Memo 1977-5. Petitioner presented no documentation for the loan beyond the check payable to himself and Cerrulli. The loan had no fixed terms and did not call for the payment of any interest. Petitioner provides no evidence of its value at the beginning of the tax year and fails to point to any identifiable event showing that it became worthless during the tax year. Petitioner made no attempt to collect the debt, work out an alternative payment plan, or obtain any of Cerrulli's inventory in satisfaction of the debt. On this record, we hold that petitioner has not established the existence of a bona fide debt, and, even if we did recognize it, petitioner has failed to prove its value at the beginning of 1981 and that it became totally worthless during 1981. Therefore, we hold that petitioner is not entitled to a $ 10,000 bad debt deduction in 1981. Finally, we must determine whether petitioner is liable for additions to tax under section 6653(a). Negligence under section 6653(a) is lack of due care, or failure to do what a reasonable and ordinarily prudent person would do *709 under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Repsondent's determination that petitioner's underpayment of tax was due to negligence or intentional disregard of the rules or regulations is "presumptively correct and must stand unless the taxpayer can establish that he was not negligent." Hall v. Commissioner, 729 F.2d 632, 635 (9th Cir. 1984), affg. a Memorandum Opinion of this Court. Petitioner therefore bears the burden of proving that he is not liable for the additions to tax. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757, 791 (1972). Petitioner has presented no objective facts indicating a persuasive argument concluding that he is not liable for the additions to tax. He offers only the fact that a certified public accountant prepared his tax returns for the years at issue and his naked assertion that he believed they were correct when filed. In addition to our holding for respondent herein, petitioner conceded that he overstated several deductions and failed to include several items of income on his tax returns for the years at issue. On this record, we hold that petitioner is liable *710 for the additions to tax under section 6653(a). Decision will be entered under Rule 155.